Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 10-0859-01 RS |
| | ) | |
| GARY HARDEMAN, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Tuesday |
| _____ | ) | October 4, 2011 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          MELINDA L. HAAG
                          United States Attorney
                          450 Golden Gate Avenue, 11th Floor
                          San Francisco, California  94102
              **BY:  OWEN MARTIKAN, AUSA**

**For Defendant:**          BARRY J. PORTMAN
                          Federal Public Defender
                          450 Golden Gate Avenue
                          San Francisco, California  94102
              **BY:  DANIEL BLANK, ASSISTANT PUBLIC DEFENDER**

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                  *Official Reporter - U.S. District Court*

```
 1                    P R O C E E D I N G S
 2   OCTOBER 4, 2011                              3:03 P.M.
 3
 4          THE CLERK:  CR 10-859, USA versus Gary Hardeman.
 5          MR. MARTIKAN:  Good afternoon, Your Honor.  Owen
 6   Martikan for the United States.
 7          THE COURT:  Good afternoon, Mr. Martikan.
 8          MR. BLANK:  Good afternoon, Your Honor.  Daniel Blank
 9   on behalf of Mr. Hardeman.
10          THE COURT:  Good afternoon, Mr. Hardeman.
11          THE DEFENDANT:  Good afternoon.
12          MR. BLANK:  Mr. Hardeman is present.  He's out of
13   custody.
14          THE COURT:  Very well.
15          This matter is on calendar for defendant's motion to
16   dismiss the indictment for -- the indictment delay.  I have
17   looked through the papers, and let me give you my tentative
18   view on this, and then you can direct your comments
19   accordingly.
20          I am inclined to deny the motion.  The reason for
21   that is that I don't think that the defense can present actual
22   prejudice, which is the threshold showing that needs to be
23   demonstrated for a successful motion for pre-indictment delay.
24   Let me just go through a couple of reasons.
25          The argument seems to be here that the effect of
```

1   delay has been that the defendant was precluded from seeking a

2   court order to require a psychological evaluation of the

3   victim, the alleged victim, closer in time to the conduct that

4   is charged here and, therefore, the defendant was deprived of

5   obtaining important impeachment evidence.

6           And then, in addition, that the delay also impacted

7   the ability to obtain witnesses and records from the shelter

8   that I understand the victim had contact with in Mexico.

9           With respect to the psychological examination, I

10  think that whether or not a court would have ordered the

11  psychological examination earlier, at an earlier point in time,

12  is an entirely discretionary question.  And I think it's

13  speculative to assume one way or the -- I think it's

14  speculative as to whether or not a court would have required

15  such an examination.

16          In addition to that, this all arises against the

17  background, as I understand it, of extensive impeachment

18  material the defendant has.

19          To the extent there are notes from prior

20  examinations, these facts that the defense indicates they would

21  want to elicit with respect to the mental situation of the --

22  of the victim and hearing voices and the like, that's all

23  documented in terms of the material that's already out there.

24          So I don't see what this examination would have done

25  even if it had been done earlier, even if the Court had ordered

1    that the victim be subjected to an examination.

2          With respect to the shelter records and the witnesses

3    that are associated with that, again, I just think it's

4    entirely speculative as to what would -- might have arisen from

5    those records.  And so this is a -- we don't have a statute of

6    limitations, as I understand it, with respect to this

7    particular charge.

8          So it's a Fifth Amendment due process argument.  And

9    at the -- I think at the end of the day we don't get to the

10   point the Huntley case in the Circuit talks about weighing the

11   length of delay balanced against the reason for the delay.  I

12   don't think we get to that point because I just don't think

13   there's a showing, at this juncture, that there was any actual

14   prejudice that resulted such that I don't even think weighing

15   comes into the equation.

16         So that's my view having read through your papers and

17   looked through your authorities.

18         So, Mr. Blank, I'll turn to you first.

19         **MR. BLANK:**  Your Honor, thank you.

20         I appreciate Your Honor's remarks that it is entirely

21   discretionary for the Court to determine whether to order such

22   evaluation if a timely motion had been brought.  But that

23   doesn't necessarily make it speculative.

24         A court could have used its discretion by not

25   granting something within its power to decide whether to grant

1    or not if it's overwhelmingly required.  And this would be the

2    same standard that an appellate court would apply if a district

3    court -- if in the normal course.  If the case was brought in

4    the normal course and I requested the evaluation and the Court

5    denied my request, then that would be reviewed for an abuse of

6    discretion.

7            The Court of Appeals wouldn't just say, well, it's

8    entirely discretionary and so it's speculative as to whether

9    there was harm or not.  So I don't think it works just to say,

10   well, it's entirely speculative and so we don't need to go any

11   further.

12           I think the Court will have to -- actually have to

13   determine whether it would have been an abuse of discretion for

14   the Court to deny the request if it were timely made.  And I

15   would have timely made it.

16           And if you apply the test, the standard that I cite

17   in my brief, I think it overwhelmingly weighs in favor of

18   ordering such an evaluation such that if the Court had declined

19   to grant the request, it would have been an abuse of

20   discretion.

21           **THE COURT:**  Well, what is it that you -- am I correct

22   that what you would be seeking through this, had this

23   examination been done, is impeachment material, right?

24           It's not a competency question.  You're not talking

25   about some sort of -- well, competency in the sense of ability

1   to testify with probative evidence, I suppose.  But, you know,

2   what is it that you think you have been deprived of?

3          **MR. BLANK:**  Sure.

4          **THE COURT:**  Because it certainly seems to me that the

5   record now is replete with all the things you think you're

6   going to get from such -- would have gotten, I should say, from

7   such an examination.

8          **MR. BLANK:**  Well, almost but not quite.  There -- to

9   be candid, Your Honor's right, there is a lot of impeachment

10  evidence, but not the thing that I think would have been

11  important -- particularly important in this case.

12          It is -- what we're talking about is a competency

13  evaluation.  And if she had been found incompetent, then she

14  couldn't have testified at all.

15          **THE COURT:**  But I didn't understand your motion to be

16  saying that.  I thought your motion wasn't arguing that, had we

17  been able to have this examination, then the -- as a witness,

18  the victim would have been precluded from testifying and,

19  therefore, we're now faced -- she's been brought back to a

20  position of competence and so we've been deprived of our right

21  to have our moment in time when she was incompetent.  I didn't

22  hear you arguing that.

23          **MR. BLANK:**  And that's -- and that's not my argument.

24          **THE COURT:**  Okay.  So then it really is that you

25  would have wanted ammunition for use when she did take the

1 stand.

2          **MR. BLANK:**  That's right.  And the -- the test that I

3 cite in the brief talks about the importance of such an

4 evaluation when the only evidence is the testimony of the

5 alleged victim.

6          **THE COURT:**  Right.  But you have -- you have quite a

7 bit of material.  And at its best, it would be cumulative.

8          **MR. BLANK:**  Well, it's not cumulative because it's

9 not precise in time.  The nearest evaluation that we have of

10 her is one that was provided to me unredacted in the discovery

11 in the earlier case, is 2005.  The events in this case happened

12 at the end of 2007.

13          So I will be facing an argument, perhaps, in light

14 of --

15          **THE COURT:**  I believe there's other material, though,

16 isn't there?

17          **MR. BLANK:**  There is other material, but there's not

18 been a psychological or psychiatric evaluation.  And having

19 just impeachment material is not enough.  I mean, I would

20 certainly make use of it, but my point is not to show that

21 she's untruthful in general or that she has behaved erratically

22 in general.

23          I would want to delve more into the particular

24 delusional psychosis that she was suffering from at least in

25 2005, and apparently continued to suffer from, just from what

1   we can glean from other sources.  But that's not the same.

2          I mean, if Your Honor's ruling is that I have enough,

3   then that -- that may be Your Honor's ruling.  But I just

4   wanted to be clear that I don't have what I will be asking for.

5          **THE COURT:**  Well, I'm not in a position to rule on

6   the questions you've just presented.  Do you have enough?  I

7   mean, that's not what I'm looking at.

8          But I do come back to the question that it seems that

9   the type of information and the use that you are indicating you

10  want to put to this information is cumulative.

11         Now, whether or not it's convincing at the end of the

12  day or not is not for me to say.  But, my only point is, this

13  is not a case where you're saying, you know, a piece of

14  evidence that would have identified a different person as the

15  witness is now -- we're deprived of that.  This is not that

16  kind of case.  This is, we would like to be able to have more

17  of the same.

18         And I hear you that it's of a different, perhaps,

19  variety in terms of the -- it would have been done, you're

20  saying, in an examination format, and you're indicating to me

21  you don't think you have contemporaneous information.  But it's

22  all of the same kind and it's all going to the same point.

23         **MR. BLANK:**  It is, but what it -- it allows the

24  government to respond is that, first of all, there could be a

25  motion in limine to say that the 2005 evaluation is not timely,

1   and so I couldn't bring that in at all because it's not --

2           **THE COURT:**   I'm not prejudging that question.

3           **MR. BLANK:**   Okay.   So that's -- I mean, that's

4   obviously a problem.   And if that were the Court's ultimate

5   ruling, then that would perhaps raise again the issues of

6   prejudice that I suffer.

7           I won't belabor the point.   I think that I've made my

8   point about what I was missing.   I hear Your Honor correctly

9   saying that there's other materials that we have.   You know, I

10  guess we can see how it plays out.   That's with respect to the

11  first issue, which was the psychological evaluation.

12          But the second one, again, Your Honor, mentioned that

13  it was speculative.   It's actually not.   We do have a clue

14  because what I cited in the brief, which was attached to my

15  declaration, was the log and the State Department referring to

16  statements made by the folks at the shelter where she was

17  staying about her untruthful or erratic behavior.

18          So we know there was something there.   So it's not

19  entirely speculative.   I'm not just guessing that someone there

20  would say that she was behaving in an untruthful or suggesting

21  an incompetent way.   I have more than that.

22          Now, Your Honor might say that that's still not quite

23  enough because we don't know exactly what the person would have

24  said or who would have said it or what the records would have

25  shown.   But I don't think it's quite fair to say it's entirely

1  speculative.  I think we -- it's substantiated, corroborated to

2  some extent.

3          And what is true then is that we're lacking the

4  witnesses and the records that would have been there if it had

5  been brought in a timely manner.

6          Of course, as Your Honor mentioned, this is the same

7  type of evidence.  It's not actual innocence evidence.  I'm not

8  sure that that's the standard.

9          To be prejudiced, I'd have to show that it was actual

10 innocence.  But it is --

11         **THE COURT:**  I agree.

12         **MR. BLANK:**  -- indeed impeachment.

13         **THE COURT:**  I agree.

14         Mr. Martikan.

15         **MR. MARTIKAN:**  Your Honor, just one point with

16 respect to the psychological evaluation issue.  And I think

17 it's a specific kind of speculation that maybe hasn't been

18 addressed yet.  And that is, at what point would this kind of

19 evaluation be most probative in time?

20         Now, there's this one evaluation from a couple of

21 years before the event.  I think there are problems with it,

22 but I -- so I don't want to say that I endorse its conclusion.

23         But, is the question, what was her frame of mind when

24 she crossed paths with this defendant?  We can never know that.

25 That evaluation would have had to have been done December '07.

1   It could never have happened.

2          So then the question becomes what is the probative

3   value of an evaluation that was done, say, a year later?  Or,

4   is it perhaps more probative to have an evaluation done right

5   now, right before trial, before she takes the stand?  Maybe

6   that's when it's most probative, rather than some particular

7   random point in time after this crime -- six months, a year,

8   year and a half, whatever.

9          Maybe now, before trial, is when it would -- and I'm

10  not saying it's proper, but speculating, as defense has --

11  would be most probative, because then you're saying:  What is

12  her character like as a witness today?  Should you believe this

13  person?

14          So I think, again, for those very reasons, it's too

15  speculative to say at what point the report, had it even been

16  ordered, would have been most probative.

17          **THE COURT:**  How about the shelter records and the

18  shelter witnesses?

19          **MR. MARTIKAN:**  I think there's just -- there's just

20  too much -- there's too much of a gap between what -- what they

21  said and what might have been found.  You know, we don't

22  know -- we don't know what those records said.

23          Someone said they didn't think she was a reliable

24  reporter.  Maybe that's because they believed that what

25  happened to her was worse than what she said.  It's speculation

1  as to what they meant by that.  But it's also speculation as to

2  what else, if anything, there might have been.

3          **MR. BLANK:**  Your Honor, we'll submit.

4          **THE COURT:**  Okay.  I'll give you a written order.  I

5  have to go back and check a couple of things, but I'll give you

6  a written order in a matter of days.

7          Are we all on track for proceeding along?

8          **MR. BLANK:**  Well, Your Honor, there was another

9  motion that was noticed for today, which is the ex post facto

10 motion.  This was the one that was originally noticed for

11 today, and Your Honor continued the other one to make it for

12 today as well.

13         **THE COURT:**  I guess somehow that one got lost in the

14 shuffle.  So why don't you remind me of --

15         **MR. BLANK:**  Sure.  So the argument -- this pertains

16 to Count Two.

17         **THE COURT:**  Okay.

18         **MR. BLANK:**  And that Count Two, Your Honor may

19 remember, is a charge that says if you commit an enumerated

20 offense -- in this case, Count One -- while under a duty to

21 register, then you have to be punished ten years' mandatory

22 minimum consecutive --

23         **THE COURT:**  Right.

24         **MR. BLANK:**  -- as well.  I don't know if that's

25 ringing a bell.

```
 1              THE COURT:  It is.  Was this filed long before this
 2   motion?
 3              MR. BLANK:  No, it was filed after this -- the
 4   prejudicial delay motion, which was originally noticed for
 5   argument back in September.  But then I filed another pretrial
 6   motion pursuant to a stipulated order regarding the finality of
 7   the pretrial briefing.  And Your Honor then moved the argument
 8   on prejudicial delay to today so that they would be on the same
 9   day.
10              THE COURT:  Right.
11              MR. BLANK:  I'm happy to go forward with the argument
12   or --
13              THE COURT:  Yes.
14              MR. BLANK:  Okay.  So it's under the ex post facto
15   clause, although it's a little complicated because the bill of
16   attainder clause actually plays a role.  And, more
17   specifically, the bill of pains and penalties -- which I didn't
18   even know what that was before I started researching this
19   motion, but just so that we're all on the same page of the
20   vocabulary, the difference between ex post facto and bill of
21   attainder is that the ex post facto prohibits the application
22   of retroactive punishment to after a conviction.
23              And a bill of attainder prohibits the application of
24   retroactive punishment where there was no judicial conviction.
25   Normally, in the Colonial times, bills of attainder were
```

1    specific to a particular person.  A legislature would say we're

2    going to lock up this particular person.  But it also applies

3    to classes of people.

4          And, again, in Colonial era, the bill of attainder

5    was specifically referencing the death penalty.  So there's

6    such a thing as called the bill of pains and penalties; which

7    is anything that's not the death penalty would be a bill of

8    pains and penalties.  But the Supreme Court has said the bill

9    of attainder clause applies equally to that.

10         The big picture is that what all this prohibits is

11   retroactive punishment.

12         The registration requirement in the State of

13   California, under California Penal Code 290.007, purports to

14   apply a registration requirement to people who have had their

15   convictions expunged under California Penal Code 1203.4.

16         And Your Honor will remember that the procedure for

17   that is that the person, after serving their probationary term,

18   is able to withdraw their plea.  They enter a not guilty plea.

19   The case is dismissed and conviction vacated.

20         And the California legislature said, doesn't matter.

21   Even if that's true, we -- on this class of people, people

22   who've had their convictions vacated under 1203.4, you still

23   have to register as a sex offender.

24         And the California courts upheld that against

25   numerous challenges in different types, but in particular as

1  against a challenge under the ex post facto clause because they

2  said registration isn't punishment.

3          It is retroactive.  The legislative requirement

4  that's imposed on you happened after you committed whatever

5  conduct you committed, after any plea was made or not made,

6  after any conviction was made or not made, and in

7  Mr. Hardeman's case and with respect to the most recent one,

8  even after your convictions are even vacated.

9          It is retroactive, they said.  You're right about

10 that.  But mere registration, it said, is not punishment.

11 There is a test that's applied.  And there's a multi-factored

12 test that's applied in lots of different context, but

13 effectively said, look, this is nothing like imprisonment --

14          **THE COURT:**  Okay.

15          **MR. BLANK:**  -- so it's not punishment.

16          Other parts of the registration requirements have

17 been struck retroactively under the ex post facto clause.  For

18 example, the residency requirements.

19          Under Jessica's Law they said, okay, that's not just

20 having your name on a list.  That is akin to banishment.  And

21 so that would violate the ex post facto clause as applied to

22 people who had already committed whatever they committed before

23 the legislature said you have to register.

24          Okay.  So that's the state of law in California.

25 Along comes this -- the statute that's now been charged against

 1  Mr. Hardeman in Count Two in 2006.  And what it does is apply

 2  punishment.  So this is sort of the missing piece.

 3       This thing violates the ex post facto and bill of

 4  attainder clause if it applies retroactive punishment.  We know

 5  the registration requirement is retroactive.  Before there was

 6  no punishment.  Now there's punishment.

 7       And what it says is that if you commit an enumerated

 8  offense now while under a duty to register.  Now, what's

 9  important is that it doesn't say while having failed to comply

10  with the duty to register.  So there's no new act or failure to

11  act with respect to a registration requirement.  It's just

12  under some duty to register.  Then you will get additional

13  punishment.  Not just an additional --

14       **THE COURT:**  That's the Sorna provision.  That's in

15  the federal statute.

16       **MR. BLANK:**  It's not Sorna specifically, but it was

17  within that whole time period when Sorna was enacted.

18       **THE COURT:**  Okay.

19       **MR. BLANK:**  And what it -- so what it exactly says is

20  really important too, because it doesn't just say this is

21  another new offense.  The statutory maximum is ten years.  And

22  it's up to the judge whether it can be concurrent to or

23  consecutive to, whatever, to the new enumerated offense.

24       It's mandatory minimum ten, consecutive to the

25  enumerated offense.  So what that does is say, look, what's

 1  being punished is more than just the new offense.

 2         The government's response, we anticipated, was to

 3  say, look, this isn't a retroactivity problem.  He's getting

 4  punished, if he gets convicted in Count Two, for this new

 5  conduct, the enumerated conduct, and it's just a sentencing

 6  enhancement attached to that.

 7         But here's where that argument fails, is that

 8  whatever the punishment is going to be for Count One, for what

 9  any other enumerated offense that they would charge, that's

10  that.

11         What Count Two punishes, and all it punishes, because

12  it has to be in addition to Count One, consecutive to, is the

13  duty to register.  And so now what we have is retroactive

14  punishment.

15         That's why the registration requirement that is

16  supposedly applicable to Mr. Hardeman, he's still litigating in

17  a state court, is unconstitutional.

18         So why am I talking about that here in federal court?

19  Well, the Supreme Court in Mendoza-Lopez says that when an

20  administrative determination is the element of a new criminal

21  offense -- in Mendoza-Lopez, it was the illegal reentry, and

22  the administrative determination was whether someone should be

23  deported or not -- when that's an element of the offense, it

24  can be collaterally attacked in the criminal prosecution.

25         So that's what I'm doing.  I'm collaterally attacking

1    this underlying element, which is an administrative

2    determination.

3            Sex offender registration is administrative.  The

4    California courts have uniformly held that.

5            And another requirement that I have to show is that

6    he did not have any other opportunity for judicial review in

7    the state court or, in the case of Mendoza-Lopez, in the

8    immigration courts.  And he didn't.

9            That's the whole problem with this retroactive

10   application, is that after the offense, after any plea -- and,

11   like I said, with respect to the more recent one, even after it

12   had already been expunged, that's when this happened.

13           And there was no ability then to say, oh, I'm sorry,

14   Your Honor, I actually want to challenge the constitutionality

15   of that.  Even more so because the registration requirement

16   didn't -- wasn't unconstitutional until 2006.

17           There was no basis to challenge the registration

18   requirement collaterally in the state court until the federal

19   statute was passed creating this punishment.

20           This is -- it's an odd situation because what

21   happened is that the federal statute grafts a federal crime

22   onto a state registration requirement.

23           So it's funny to be saying, well, a state

24   registration requirement was made punitive by a new federal

25   charge.  But that's sort of what you get when Congress says

1   we're going to have this additional punishment not based upon

2   Sorna, not based upon a federal registration requirement, but

3   piggybacking on a state one.

4          And from the state's perspective, you know, they're,

5   hey, we have this registration requirement.  It's retroactive,

6   but there's no punishment.  And the California legislature has

7   never imposed any punishment, with the exception of Jessica's

8   Law.  Although I think even that was a proposition.

9          But, in any event, that's -- so we're at this weird

10  intersection of two very, very broad statutes that just

11  uniquely affect Mr. Hardeman because of the timing of his

12  expungements, because of the timing of the new federal statute.

13         So I'm collaterally attacking this requirement, and

14  it's unconstitutional for that reason.

15         The second half of my motion had to do with *Apprendi*.

16  I've just made, obviously, a Constitutional argument to Your

17  Honor about why the underlying registration requirement is

18  unconstitutional.  And Your Honor will rule on that one way or

19  the other.

20         But even if Your Honor rules against me on Your

21  Honor's legal analysis of that, it's still an element of the

22  offense.  And under *Apprendi*, a jury has to pass on each

23  element of the offense as a factual matter.

24         **THE COURT:**  That one I'm not following you at all.

25  The jury would be making the determination.  Count Two is the

1   count the jury has to consider.

2          **MR. BLANK:**  It is, but --

3          **THE COURT:**  If the jury finds in the government's

4   favor on that count, I'm not sure where there's -- where is the

5   *Apprendi* problem?

6          **MR. BLANK:**  I'll explain.  What the Supreme Court has

7   said is that an unconstitutional act cannot impose a duty.  In

8   other words, an unconstitutional law cannot impose a duty.

9          The second element of Count Two is, was Mr. Hardeman

10  under a duty?  So the question is whether the enactment of the

11  statute in Count Two rendered the registration requirement for

12  him unconstitutional.

13         That is a multi-factor constitutional analysis that

14  judges can do but that juries cannot.  And because Count Two --

15  the statute underlying Count Two was written the way that it

16  was, without any new act that could be pointed to as the fact

17  to be proven -- in other words, for example, a failure to

18  register -- instead, we just have a duty.

19         It's a very strange animal, the statute which says a

20  jury has to find as a factual matter whether someone has a duty

21  or not.

22         Now, that could be easy in 99.9 percent of the cases

23  where someone actually has a conviction, an extant conviction,

24  at the time of the new offense, one that's enumerated and that

25  results in registration.  There they just have to show, just

1   like in a 922(g) case, is there a conviction?  Yes, there is.

2          And, in fact, under *Apprendi* there's a whole

3   exception for prior convictions because of the process you get

4   there.  That's not what we have here.

5          Because the California registration requirement

6   applies even in the absence of a conviction, we don't have

7   something for the jury to point to as a factual matter.

8          At least we don't have anything that is admissible at

9   trial.  Federal Rule of Evidence 410 -- I've sort of alluded to

10  this before --

11         **THE COURT:**  Isn't the jury just going to decide

12  whether or not he registered or not?

13         **MR. BLANK:**  No, see, whether he registered or not is

14  irrelevant.  It's whether he had a duty to register or not.  So

15  even if he did register, that doesn't --

16         **THE COURT:**  Why not -- I don't follow you why there

17  can't be evidence presented to the jury to consider whether or

18  not he had a duty.

19         **MR. BLANK:**  The only evidence that could underlie

20  whether he had a duty or not is the withdrawn pleas, the

21  withdrawn guilty plea from the felony from 1980, and the

22  withdrawn nolo plea from 1986.  Categorically, under Federal

23  Rule of Evidence 410, those are inadmissible at trial.

24         **THE COURT:**  Well, I assume the government has some

25  argument as to why that's not so.

1          **MR. BLANK:**  Maybe.  And perhaps I should turn over

2    the floor.  But, anyway, that's the nature of my argument.

3    It's sort of a two-parter dealing with Count Two.

4          **THE COURT:**  Okay.

5          **MR. MARTIKAN:**  Thank you.

6          And, your Honor, obviously there are a lot of moving

7    parts here.  I don't think they all fit together quite the way

8    the defense argues.  And I'm also not -- it's hard to figure

9    out which part to pull on first.  But I'm going to start with

10   Mendoza-Lopez because that's the Supreme Court case that sort

11   of seems to be the crux of the alleged due process issue.

12         So the Supreme Court says in the United States versus

13   Mendoza-Lopez, if you have an administrative hearing and the

14   result of that administrative hearing becomes the element of a

15   crime, and there was no meaningful judicial review opportunity,

16   then there has to be one given in the context of the criminal

17   proceeding.

18         That doesn't apply here for a couple of reasons.

19   First, there's no administrative hearing.  Here we had a

20   full-blown judicial hearing.  It was a criminal case.  And the

21   defendant, he entered pleas in both of those cases.  He made a

22   colloquy.  He waived his rights.  He showed that he understood

23   what they were.  And he certainly, had there been some problem,

24   had an opportunity for direct judicial review at that point.

25         So those two sort of fundamental pieces that worried

1  the Court in Mendoza-Lopez, one, you've got an administrative

2  kind of, perhaps, loosey-goosier hearing than a judicial

3  proceeding that is at the time simply based on finding an

4  administrative remedy.  In that case, removal from the

5  United States.  All of a sudden, it becomes the elements of a

6  crime.  But there was no judicial review process in place at

7  that time.

8          Here you don't have either of those pieces because

9  you have an actual bona fide judicial review process where

10  defendant's represented by counsel, is informed of his rights,

11  and makes a knowing decision.  And if there's a problem with

12  that, there's an opportunity for review.  So we don't have that

13  problem.

14          Now, the -- and the outcome that is relevant to

15  defense here is -- and that he knew of at the time, is that he

16  became a person required to register as a sex offender.

17          Now, maybe at that time he thought, well, that's okay

18  because a few years down the road maybe I can get this expunged

19  and I won't have to register as a sex offender anymore.

20          Then he finds out, I have to register, or I think I

21  have to register.  I don't know what his legal position is now.

22  But he believes -- he's informed that he has to register again.

23          The problem with teasing that piece of it out is that

24  that, as the California courts have held and as, frankly, also

25  the Ninth Circuit has held, that's an administrative issue.

1   That is not a punitive -- a punitive -- that's not a

2   punishment.

3           So you can't tease out that one little piece, which

4   is a purely administrative remedy, and say, well, that's a

5   punishment that was applied without due process, because he had

6   the due process, and that piece of it is not a punishment.

7           Now, to go into it a little bit further, there is a

8   sort of ex post facto issue with 2260A -- the alleged ex post

9   facto issue.  That law was passed in 2006, so as an initial

10  matter, it comes in a year before the crime that's alleged in

11  this case.

12          So you don't have the classic ex post facto issue, so

13  you have to look at something else.  That something else on the

14  defense side is this issue of the registration requirement,

15  which kind of overlooks the fact that the real -- the kicker in

16  that case is that you have to commit an enumerated violent sex

17  crime.

18          So it's not that the status of being a person

19  required to register suddenly subjects you to additional

20  penalties.  You also have to go out and commit what the

21  legislature has defined as pretty serious violent criminal sex

22  offenses.

23          In effect, that's no different than a lot of crimes

24  which provide, at least in the sex crime context -- for

25  example, a child pornography crime, there's one set of

1  punishments for a first offender.  Someone that has committed

2  any other kind of sex offense, including a child pornography

3  offense, they're subject to a higher penalty.

4         So the higher penalty isn't really ex post facto

5  because they have this prior offense.  It's because of the new

6  conduct.  And that's what the 11th Circuit says in that one --

7  there's an unpublished opinion regarding 2260A that I cite in

8  my papers, *United States versus Carver*.

9         Then we get, I believe, to the *Apprendi* issue, which

10 I think is premature.  I think it's easiest, frankly, to push

11 that down the road because there are a couple of issues.  One

12 is the admissibility of evidence, which we haven't gotten to

13 yet and which we're going to litigate, I'm sure, at length from

14 all different aspects.  And so that issue of what actually

15 comes to the jury isn't decided and not yet ripe.

16        And, second, the issue of how they're instructed.

17 And there's going to be, I'm sure, a lot of litigation over the

18 instructions.  And so when we don't know what's going to go to

19 the jury and we don't know how they're going to be instructed,

20 I don't see how you can say there's some kind of a

21 constitutional violation with respect to the punishment, if

22 there is one that results.

23        **THE COURT:**  So you're saying -- you're not opposing

24 their motion.  You're just saying it's -- it should wait

25 another day?

 1          **MR. MARTIKAN:**  Well, I don't think it's -- I don't

 2  think this is what *Apprendi* is about.  So I can't look at it

 3  as, really, an *Apprendi* issue because usually the solution to

 4  the *Apprendi* issue is you present the issue and get it decided

 5  beyond a reasonable doubt by a jury.  Which we're happy to do.

 6          It's really sort of a -- I don't know, son of

 7  *Apprendi*, which is that somehow we can't present it to the jury

 8  because we can't present the right evidence and we can't

 9  instruct them without violating rights.  And all those issues,

10  those specific issues, I think, have to be for another day.

11          I will say, Rule 410 I don't think is a bar in this

12  case.  I'll just say, just for the purpose of making an initial

13  point -- and it was raised in the reply brief, so it hasn't

14  been briefed fully, at least on the government's side -- but

15  Rule 410, there's a committee note, advisory committee note,

16  where they say they intend that it is superseded by any

17  subsequent rule of criminal procedure or act of Congress that's

18  inconsistent with it.

19          So I don't think that it should be read as somehow

20  preventing us from providing evidence that we would have to

21  provide as an element of a charged crime.  But I also think

22  that's an issue that should, and I'm sure will be, fully

23  briefed in motions in limine.

24          **THE COURT:**  Well, let me go back.  I'll be candid

25  with you.  I thought somehow -- I think my system is pretty

1  good, but somehow this particular motion, which now some of

2  which is coming back to me, wasn't in the forefront of my mind

3  when I came out here.  So I need to go back and look at the

4  briefs again and come up to speed.

5            I'm not proposing to have a further hearing on it.

6  I'll look through the written briefs and, with the benefit of

7  your discussion today, I'll be prepared to give you an order on

8  that.  But I think I need to do that first.

9            **MR. BLANK:**  I understand, Your Honor.  I wonder if

10  just then for the record and to the extent it might be helpful

11  to Your Honor just to respond briefly to what was said by

12  government counsel, and then I'll --

13            **THE COURT:**  Very.

14            **MR. BLANK:**  -- submit.  Thank you.

15            There was no judicial hearing on this case.  And the

16  reason is that at the time that Mr. Hardeman entered his

17  pleas -- and I think government counsel eventually acknowledged

18  this -- the law was such that he was not required to register

19  forever in the event that his convictions were expunged.  So

20  there was no problem to resolve there.  There was nothing for

21  him to raise.

22            And, more so, there was no new additional punishment,

23  which I'll get to in a second, from 2260A.  So at the time he's

24  in front of a judge, there is no problem for him to complain

25  about.  The problem was after the fact.  And that's why we have

1  this issue.

2          Mendoza-Lopez did indeed deal with administrative

3  hearing, but the Ninth Circuit subsequently, in the Varahaz

4  (phonetic) Alvarado case, dealing with administrative removal,

5  where there is no hearing, said, and I quote, that the right to

6  collaterally attack, quote, applies whether it was a procedural

7  error or a statutory mandate that deprived the alien of the

8  judicial review.

9          So Mendoza-Lopez doesn't depend upon there being a

10  hearing and procedural error if, just by legislative fiat, you

11  don't have a chance to get judicial review that gets us in the

12  ballgame.

13          And the issue with respect to 2260A, there is a hook

14  of this enumerated offense, but it's what ex post facto clause

15  jurisprudence talks about as additional punishment.  And I

16  don't see how you can say that ten years' mandatory minimum

17  consecutive is not additional punishment.

18          He has no extant conviction, so it's not a recidivism

19  issue.  The 11th Circuit in a published case the government

20  counsel has cited had to do with the cruel and unusual

21  punishment clause.  Not worth citing here.

22          And *Apprendi* deals with more than just sentencing.

23  *Apprendi* actually applies to the charge as well.  So I don't

24  think -- it's not ripe for me to raise this.

25          And with that, Your Honor, I'll submit.

1          **THE COURT:**  Thank you.  I'll go back and go through

2  it all and give you an order.

3          **MR. BLANK:**  There is an issue with the trial date

4  that we wanted to raise with Your Honor.

5          We're currently set to go on November 14th.

6  Something has come up for me.

7          Specifically, I've been set with two unmovable --

8  because the Ninth Circuit has ordered them to be on this

9  expedited schedule -- unmovable oral arguments before the Ninth

10  Circuit on November 15th, the day that we would presumably be

11  doing our opening statements here.

12          I've talked to government counsel and we have a joint

13  proposal to move the trial date by just a few weeks.  I had

14  originally wanted to just delay by two weeks.  Government

15  counsel said that that's -- that doesn't work, he would need an

16  extra week.  That's fine with us.

17          So the proposal would be to actually commence with

18  opening statements and testimony on December the 5th.  That

19  would give us three weeks before Christmas.  I think we would

20  be able to get in, no problem.  I can't go into 2012 because I

21  have witnesses who will not be available starting in January,

22  so it has to be in 2011.

23          I saw Your Honor shake your head.

24          **THE COURT:**  Well, everything is slipping back and

25  collapsing.  I mean, this is not your problem, but several

1  cases that have been moving inexorably back and it's caused a

2  train wreck.  And so I'm not entirely sure what I can do.  And

3  I think I had some things set in December.  So that's why it's

4  going to create problem.

5          And then I'm -- one of the things that moved, moved

6  into January.  And it's going to be six weeks.  And I've got to

7  do that, so.

8          **MR. BLANK:**  Well, we can't do January anyway, so

9  that's --

10          **THE COURT:**  No, I understand.  What I'm saying is

11  I've got some problems moving you back three weeks, because I

12  was sort of counting on you going in mid November so I could

13  free up.  But why couldn't it start on the 28th of November?

14          **MR. MARTIKAN:**  Your Honor, that was my issue.  The

15  issue is that that is the Monday after the Thanksgiving

16  weekend.

17          **THE COURT:**  Right.

18          **MR. MARTIKAN:**  And I have a lot of out-of-town

19  witnesses.  That's the worst possible weekend, probably, of

20  flying them in in the year.

21          **THE COURT:**  True.  But then you have to wait a full

22  week to clear out the Thanksgiving -- why couldn't it start on

23  Tuesday or start on Wednesday or something like that?  I mean,

24  why should we just give up that whole week on the theory that

25  travel is tough over the weekend.

1          **MR. MARTIKAN:**  Well, I guess we wouldn't have to give

2     up that whole week if we could do it on -- if Your Honor could

3     maybe start on a Wednesday or -- maybe we could pick a jury

4     that Wednesday.

5          **THE COURT:**  Well, let me take your proposals back

6     to -- let me go look at my calendar when I go back and see

7     where things stand and what can be moved along.

8          What is your -- I mean, Mr. Martikan has just gotten

9     through telling me all the things that we're going to have to

10    be litigating like crazy.  So I'm not getting the impression

11    that this is going to be a streamlined trial process.

12          So just based on what you're all telling me, I think

13    I need to build in more time to deal with all the twists and

14    turns that you're warning me are coming my way.

15          What -- what is your expectation on how long this

16    trial would take?

17          **MR. MARTIKAN:**  Well, you know, I think -- I don't

18    think the actual testimony will take all that long.  I don't --

19          **THE COURT:**  What does that translate into in terms of

20    days?

21          **MR. MARTIKAN:**  I think that we could do our

22    case-in-chief in four days, maybe three.  I mean, it's -- you

23    know, there's the victim -- the alleged victim.  That's going

24    to take up a lot of time.  And then there are some witnesses

25    that we are going to get in through Rule 15 depositions.  That

 1  should go through pretty quickly.  They are relatively minor.

 2          And then there are some three to six sort of

 3  corroborating witnesses, government witnesses.  I don't see it

 4  being -- I mean, we have -- there are going to be a lot of

 5  issues about what comes in and what doesn't.  But there's --

 6  the presentation I don't think will take all that long.

 7          **THE COURT:**  Okay.

 8          **MR. BLANK:**  I actually agree.  It's not that the

 9  trial will be streamlined.  Your Honor will have, perhaps, some

10  authority appellate -- appellate, that's an interesting

11  Freudian slip -- evidentiary issues to wrestle with before we

12  get there.  But the trial I expect to go at pace.

13          Obviously, I can't predict what my case is going to

14  look like until I hear from the other witnesses because the

15  majority of my witnesses would be impeachment witnesses.

16          **THE COURT:**  I understand that.  So we're talking

17  about two weeks?

18          **MR. BLANK:**  I think -- I think two weeks.

19          **THE COURT:**  Okay.

20          **MR. BLANK:**  I think that that's probably fair.

21          **THE COURT:**  Do you have any problem with the notion

22  that we would start having some trial activity in the last week

23  in November?

24          **MR. BLANK:**  That would be my preference.  My original

25  suggestion was to start on the 28th.  Mr. Martikan said that

1   was inconvenient, so I abandoned it.  But, candidly, that's --

2   my preference is to start that week.  And if we -- I'm not sure

3   why we couldn't begin the jury selection on the Monday and

4   have --

5           **THE COURT:**  Well, I mean, that's true.  If -- you

6   know, if we picked a jury on the 28th, and this probably would

7   take a little longer perhaps than the ordinary jury selection,

8   and then you've got opening statements beginning on Tuesday and

9   you probably wouldn't get too far along the path, your

10  witnesses aren't -- the bulk of them wouldn't be coming here

11  until midweek.

12          **MR. MARTIKAN:**  Well, right.  But I -- I need to -- I

13  mean, I have a minor witness coming.  I want to have them all

14  there.  I don't want to just have them arriving midweek.  I

15  want to have them all available and meet with them first.

16          I mean, if we could just at least pick a jury on the

17  29th, which is the Tuesday, start on Wednesday, just so I can

18  make sure I can gather all my witnesses.

19          **THE COURT:**  All right.  Well, I will -- I will not

20  start it on the 28th, but I may well start it on the 29th.  I'm

21  going to go back and look and see what the start -- by started,

22  meaning jury selection and then the 28th.  Under that scenario,

23  the 30th would be the beginning of the trial.  But let me go

24  back and look at my schedule and see where things stand.

25          **MR. BLANK:**  One more point on that.  Obviously,

1  moving the trial date, of course, will have an impact on the

2  interim dates that we have for discovery cutoff for in limine

3  motions.  We have a date this Friday, which is the discovery

4  cutoff date.  What we had proposed was to just track it.

5          If Your Honor moves the trial date three weeks, move

6  it three weeks; two weeks, two weeks.

7          **THE COURT:**  Fine.

8          **MR. BLANK:**  But just so Your Honor knows -- and I

9  don't mean to rush the Court, but if we are going to move it a

10  little bit, then we would need to --

11          **THE COURT:**  No, I'll tell you tomorrow what the new

12  trial date is.  I just have to go back and look at it in my

13  calendar.  Okay.

14          **MR. MARTIKAN:**  And one final thing since we're all

15  here together, Your Honor, there are going to be some grand

16  jury transcripts that are *Jenks* in this case.  And so if I

17  could have Your Honor order under Rule 6(e)(3)(e) that I can

18  turn those over to the defense so I can, despite the Rule 6(e)

19  confidentiality provisions, comply with my *Jenks* obligation.

20          My only request is, since one of those transcripts is

21  the testimony of the juvenile in this case, if I could have

22  that be a "attorneys eyes only," meaning attorneys team eyes

23  only kind of protective order.  I haven't vetted that with

24  defense, but that would be my request with respect to that

25  testimony.

1      **MR. BLANK:**  I certainly don't have an objection to

2  the Court ordering that the government can give me the grand

3  jury testimony.

4      **THE COURT:**  I don't think you would.

5      **MR. BLANK:**  And at this stage I'm willing to agree to

6  the attorneys' eyes, the attorney team eyes only for that

7  particular transcript.  Obviously, prior to trial, Mr. Hardeman

8  has a right to see them.

9          So at some point between whenever they're going to be

10  disclosed and trial, I will need to revisit that issue, perhaps

11  at the pretrial conference.

12      **THE COURT:**  Well, why don't you see if you can come

13  up with a stipulated order and with the time triggers that

14  perhaps you can work that out and just submit it to me in the

15  first instance.  If you can't, then I'll weigh into the fray.

16      **MR. MARTIKAN:**  Thank you, Your Honor.

17      **MR. BLANK:**  Because there are lots of interim dates,

18  perhaps what we could do is once we hear from Your Honor about

19  the new trial date, we will submit a stipulated order

20  addressing all those dates for your signature.

21      **THE COURT:**  Okay.

22      **MR. BLANK:**  Thank you very much.

23      **MR. MARTIKAN:**  Thank you, Your Honor.

24          (At 3:49 p.m. the proceedings were adjourned.)

25                  -   -   -   -

1

2                    **CERTIFICATE OF REPORTER**

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Friday, October 21, 2011

7                      s/b Katherine Powell Sullivan

8            _____

9            Katherine Powell Sullivan, CSR #5812, RPR, CRR
                       U.S. Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25